Jennifer Feldsher (JF 9773)
Anna Rozin (AR 4830)
**BRACEWELL & GIULIANI LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 508-6100
Facsimile:   (212) 508-6101

Attorneys for Debtor and Debtor In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br><br>**KIT digital, Inc.,**<br><br>                    **Debtor.** | **Chapter 11**<br><br>**Case No. 13-11298 (REG)** |

**MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363, AND 364, BANKRUPTCY RULES 2002 AND 4001,
AND LOCAL RULE 4001-2 (I) AUTHORIZING THE DEBTOR
TO (A) OBTAIN POSTPETITION SECURED FINANCING AND
(B) UTILIZE CASH COLLATERAL, (II) GRANTING SECURITY INTERESTS
AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

KIT digital, Inc., the above-captioned debtor and debtor in possession (the "*Debtor*"), by and through its undersigned counsel, files this motion (this "*Motion*"), pursuant to Bankruptcy Code §§ 105, 361, 362, 363, and 364 and Bankruptcy Rules 2002 and 4001, and Local Rule 4001-2, for entry of an interim order, substantially in the form attached hereto as <u>Exhibit A</u> (the "*Interim Order*"), (i) authorizing the Debtor to (a) obtain postpetition secured financing and (b) utilize cash collateral, (ii) granting security interests and superpriority claims and (iii) scheduling a final hearing.  In support of this Motion, the Debtor relies on the Declaration of Fabrice Hamaide in Support of Debtor's Chapter 11 Petition and First Day Motions, filed concurrently

herewith (the "***Hamaide Declaration***").  In further support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

2. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) and Bankruptcy Rules 2002 and 4001.

## RELEVANT BACKGROUND

3. On the date hereof (the "***Petition Date***"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is authorized to continue to operate its businesses and manage its property as debtor in possession. No trustee, examiner or statutory creditors committee has been appointed in this case.

4. Information regarding the Debtor's business, its capital structure, and the events leading up to the commencement of this chapter 11 case can be found in the Hamaide Declaration, which is incorporated herein by reference.

**Prepetition Secured Loans**

5. As of the Petition Date, the Debtor was a party to the following credit facilities and accompanying loan documents:[1]

(a) that certain Loan and Security Agreement (the "*2010 Loan Agreement*"), dated April 15, 2010, with Venture Lending & Leasing V, Inc. ("*Venture V*"), an affiliate of Western Technology Investments ("*WTI*"), pursuant to which the Debtor initially borrowed $5 million. Subsequently, on June 10, 2010, the Debtor borrowed an additional $1 million from Venture V pursuant to a Supplement to the 2010 Loan Agreement (such Supplement together with the 2010 Loan Agreement, the "*2010 Loan Facility*") and

(b) that certain Loan and Security Agreement (the "*2011 Loan Agreement*" and, together with the 2010 Loan Facility, the "*WTI Loans*") dated May 16, 2011, with another affiliate of WTI, Venture Lending & Leasing VI, Inc., for a $15 million term loan. The WTI Loans are secured by substantially all of the Debtor's assets; namely, the Debtor's interest in its subsidiaries.

None of the Debtor's subsidiaries provided direct pledges or guarantees in connection with the WTI Loans. As of the Petition Date, approximately $9.8 million in the aggregate was outstanding under the WTI Loans, including interest as of the Petition Date.

**Prepetition Marketing Efforts and Negotiations**

6. Prior to filing this chapter 11 case, the Debtor was in a liquidity crisis. Unable to access the capital markets without reliable financials or to upstream funds from its subsidiaries sufficient to maintain its operations and pay its liabilities, the Debtor determined that to reorganize in chapter 11, it would need postpetition financing to meet working capital and general business obligations through the pendency of its chapter 11 case.

7. Prior to the Petition Date, and as further detailed in the Hamaide Declaration, the Debtor engaged in an extensive marketing process to either sell substantially all of its assets or to

---

[1] Nothing in this Motion is an admission, or should be deemed to be an admission, of any liability of the Debtor under any particular credit facility, or the extent, validity, or priority of any lien, guaranty or other alleged interest in property of the Debtor.

-3-

find stand-alone financing options to capitalize the business in or out-of chapter 11. Beyond preliminary negotiations or non-binding offers for DIP financing tied to restructuring proposals, the Debtor was unable to obtain postpetition financing on better terms than the proposed debtor-in-possession financing described herein.

8. The debtor-in-possession financing (such financing, the "***DIP Facility***") is being provided by an affiliate of the Debtor's chief executive officer in connection with a restructuring proposal being sponsored by a group of shareholders (the "***Plan Sponsor Group***") led by JEC Capital Partners, LLC, an affiliate of the DIP Lender (defined below). The Plan Sponsor Group's proposal is to be effectuated through a pre-negotiated plan of reorganization that will be proposed by the Debtor and supported by the Plan Sponsor Group, all in accordance with that certain plan support agreement dated April 16, 2013 (the "***Plan Support Agreement***").[2] Among other things, the Plan Support Agreement provides for the Plan Sponsor Group to make a $25 million cash investment in return for approximately 89% of the stock of reorganized KDI. Proceeds of the Plan Sponsor Group's investment will be used to pay the Debtor's valid claims, while equityholders will be provided a meaningful opportunity to buy into the stock of reorganized KDI. Overall, the Debtor believes that the Plan Support Agreement is the best option for the Debtor and maximizes value for all of its stakeholders.

9. In accordance with the Plan Support Agreement, the Debtor, in consultation with its legal and financial advisors, negotiated and entered into, subject to Court approval, a Debtor-In-Possession Credit Agreement, attached hereto as <u>Exhibit B</u> (the "***DIP Agreement***", and together with ancillary documents, the "***DIP Documents***"), with JEC II Associates, LLC (the "***DIP Lender***"). Pursuant to the DIP Documents, the DIP Lender has agreed to fund $3 million to the Debtor to be used for working capital during this chapter 11 case. Having conducted an

---

[2] The Debtor will seek approval of the Plan Support Agreement and other relief related thereto by separate motion.

extensive marketing process prepetition, the Debtor submits that the DIP Facility terms, taken as a whole, are the most favorable terms the Debtor has received in the marketplace.

**Material Terms of the Proposed Postpetition Financing**

10.  Bankruptcy Rule 4001 requires that motions requesting authority to incur postpetition financing begin with a concise statement of the relief requested, that summarizes the material terms and sets forth where the material terms can be found in the documents. The required summary is set forth below.[3] The Debtor believes that these terms will reasonably address the Debtor's near-term funding requirements.[4]

| Material Term | Summary of Material Term | Citations |
|---|---|---|
| **Parties**<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | Borrower**:**    KIT digital, Inc. (the "***Borrower***")<br><br>DIP Lender:    JEC II Associates, LLC (the "***DIP Lender***"). | DIP Agreement Preamble; Interim Order Recitals |
| **DIP Commitment**<br><br>*Local Bankruptcy Rule 4001-2(a)(1) Fed. R. Bankr. P. 4001(c)(1)(B)* | The total commitment under the DIP Loan is $3 million. | DIP Agreement Recitals, §§ 1.1, 2.1; Interim Order Recitals |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The interest rate is 13% per annum. | DIP Agreement §§ 1.1, 2.8 |
| **Fees and Reimbursement of Fees and Expenses**<br><br>*Local Bankruptcy Rule 4001-2(a)(3); Fed. R. Bankr. P. 4001(c)(1)(B)* | Arrangement Fee: Borrower to pay DIP Lender an arrangement fee in an amount equal to $125,000 on the Closing Date of the Agreement.<br><br>Reimbursement of Fees and Expenses: Reasonable out-of-pocket costs and expenses, including reasonable attorney's fees of the DIP Lender, subject to a $500,000 expense reimbursement cap for all costs and expenses of the Plan Sponsor Group and payable upon consummation of the Plan, entry of the Debtor into an Alternate Transaction or upon an Event of Default under the DIP Facility or termination of the Plan Support Agreement by the Plan Sponsor Group (other than an Event of Default or a termination for failure to satisfy a milestone date in either agreement related to the reorganization process that the Debtor is using its reasonable best efforts to satisfy). | DIP Agreement §§ 2.12, 9.3; Interim Order ¶ 19 |

---

[3] This summary is qualified in its entirety by reference to the provisions of the DIP Agreement and related DIP Documents, and any order of this Court relating to the proposed postpetition financing described herein.

[4] Capitalized terms used in this summary and not otherwise defined shall have the meaning ascribed to them in the DIP Documents.

| | | |
|---|---|---|
| **Maturity**<br><br>*Local Bankruptcy Rule 4001-2(a)(12)*<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | All Obligations will be due and payable in full on the earliest of:<br><br>(i) July 29, 2013;<br><br>(ii) the date of conversion of this chapter 11 case to a case under Chapter 7 of the Bankruptcy Code;<br><br>(iii) the effective date of a sale of all or substantially all of the assets or businesses of the Borrower in accordance with section 363 of the Bankruptcy Code or otherwise (including a sale resulting from a credit bid of any claim or claims against the Borrower);<br><br>(iv) the date falling 21 days after entry of the Interim Order unless the Final Order is entered by the Bankruptcy Court on or prior to such 21st day;<br><br>(v) the acceleration of the loans under the DIP Loan and the Obligations in accordance with the terms and conditions of the DIP Agreement;<br><br>(vi) the appointment of any trustee or examiner with expanded powers under section 1104(c) of the Bankruptcy Code in this chapter 11 case; and<br><br>(vii) the effective date of a plan of reorganization or liquidation filed in this chapter 11 case and confirmed pursuant to an order entered by the Bankruptcy Court.<br><br>All obligations are due and payable in full on the Maturity Date in cash, however, upon the effective date of the Plan, payment of any outstanding principal amount of the DIP Loan shall be effected by the issuance of certain equity interests in reorganized KDI in accordance with the Plan Support Agreement. | |
| **Conditions**<br><br>*Local Bankruptcy Rule 4001-2(a)(2);*<br>*Local Bankruptcy Rule 4001-2(h);*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Customary borrowing conditions for funding of loans under a debtor in possession loan agreement, including but not limited to, entry of the Interim Order, execution and delivery of the DIP Agreement; payment of the Arrangement Fee and any amounts due and payable under the indemnification provisions of the DIP Agreement, delivery of the initial Budget for a 13-week cash flow forecast satisfactory to the DIP Lender and delivery of all information, approvals, documents or other instruments as DIP Lender may reasonably request.<br><br>In addition, the DIP Lender shall have received a properly completed Borrowing Request in accordance with the requirements of the DIP Agreement by 12:00 p.m. (New York time) (which for the initial Borrowing will specify the Closing Date as the date of such Borrowing) on a Business Day to be effective as a notice received on such day. | DIP Agreement Article 5 |
| **Liens and Priorities**<br><br>*Local Bankruptcy Rule 4001-2(a)(4)* | The DIP Lender will receive perfected liens and security interests pursuant to sections 361, 362, 364(c)(1) and 364(c)(2), 364(c)(3) of the Bankruptcy Code. The DIP Lender's liens will be first priority liens on all assets of the Borrower (other than the Carve-Out (as defined below)), but will be junior to the liens | DIP Agreement § 3.1, 4.3;<br>Interim Order ¶¶ 6,7;<br>Interim Order Recitals ¶ F(ii) |

-6-

| | | |
|---|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | currently securing the WTI Loans and Permitted Liens. | |
| *Fed. R. Bankr. P. 4001(c)(1)(B)(vii)* | The DIP Lender's liens will be automatically perfected without further action by the DIP Lender or the Debtor. | |
| **Carve-Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(5)*<br><br>*Local Bankruptcy Rule 4001-2(d)* | The term "*Carve-Out*" means the following items of expenses and fees that are accrued during the period covered by the applicable DIP Order and the Budget: (i) the unpaid and outstanding professional fees and disbursements incurred by the Debtor and any Statutory Committee on or prior to the business day immediately following an Event of Default and receipt of a notice of such default by the DIP Lender (the "*Default Notice*"), which have been or subsequently are approved by a final order of the Court pursuant to section 326, 328, 330 or 331 of the Bankruptcy Code, (ii) the unpaid and outstanding professional fees and disbursements incurred by the Debtor following the date of the Debtor's receipt of the Default Notice in an aggregate amount not in excess of $100,000 (the "*Debtor Carve-Out Amount*"), provided, however, that if any Statutory Committee is appointed in this case, up to $25,000 of the Debtor Carve-Out Amount may be used for payment of allowed and unpaid professional fees and disbursements incurred by such Statutory Committee, (ii) following a conversion to Chapter 7, the payment of the trustee's professional fees not to exceed $50,000, and (iii) the payment of fees pursuant to 28 U.S.C. § 1930 prior to the occurrence of such Default or Event of Default | DIP Agreement § 3.1; Interim Order ¶¶ 21, 22 |
| **Covenants**<br><br>*Local Bankruptcy Rule 4001-2(a)(8); Fed. R. Bankr. P. 4001(c)(1)(B)* | Affirmative, negative and financial covenants usual and customary for financings of this type, including, without limitation, reporting and informational requirements and restrictions on liens, sale of assets, payments, investments and indebtedness. | DIP Agreement Article 7 |
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001-2(a)(9)* | (i) The proceeds of the DIP Loan are available exclusively for the purpose of funding: (a) the reimbursement of any and all costs incurred by the DIP Lender in connection with the transactions contemplated by the DIP Documents, including, without limitation, all reasonable out-of pocket fees and expenses of Professionals retained by the DIP Lender in analysis, negotiation or administration of any aspect of such transaction, including further, without limitation, the negotiation and drafting of the DIP Documents (or any amendments thereto); provided, that such aggregate fees and expenses shall not exceed the Expense Reimbursement Cap; (b) this chapter 11 case and for the financing of Borrower's ordinary working capital and other general corporate needs, all in accordance with the approved Budget and (c) such other costs and expenses related to this chapter 11 case or the DIP Documents as the DIP Lender may expressly approve in its reasonable discretion.<br><br>(ii) Notwithstanding anything contained in the DIP Agreement to the contrary, Borrower may not use the proceeds of the DIP Loan to prosecute or otherwise pursue any claims of Borrower against | DIP Agreement § 2.2; Interim Order Recitals ¶ F(iv) |

| | | |
|---|---|---|
| | the DIP Lender or any of its Affiliates.<br><br>(iii) Except as otherwise provided, Borrower must apply the proceeds from the DIP Loan in accordance with the costs and expenses scheduled and provided in the applicable approved Budget, subject to a ten percent (10)% variance on an aggregate basis in any calendar month. | |
| **Mandatory Prepayment**<br><br>*Local Bankruptcy Rule 4001-2(a)(13)*<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Upon the occurrence of certain asset sales and casualty events and subject to any prior payment of any allowed claim in respect of the WTI Loans, mandatory prepayment of the loan under the DIP Loan is required. | DIP Agreement § 2.10 |
| **Events of Default; Remedies**<br><br>*Local Bankruptcy Rule 4001-2(a)(10)*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Events of Default**<br><br>The occurrence of any of the following events or circumstances will constitute an Event of Default:<br><br>(a)    Borrower fails to pay (i) any principal of any Loan when due, or (ii) any of the Obligations (other than principal of any Loan) when due and such failure continues for two (2) Business Days or more after the same first become due;<br><br>(b)    any representation or warranty of Borrower made in the DIP Agreement, in any other DIP Document executed in connection therewith or in any certificate, agreement, instrument or statement furnished or made or delivered pursuant to the DIP Agreement by Borrower or in connection therewith, is untrue or incorrect in any material respect when made or effected;<br><br>(c)    Borrower fails to perform or observe any term, covenant, or agreement (other than failure to pay when due any of the Obligations) contained in the DIP Agreement or in any other DIP Document executed in connection therewith, and such failure continues unremedied for five (5) days after the occurrence or omission thereof, or Borrower fails to perform, or otherwise causes or permits a default ("*Order Default*") under, any term, condition, provision or requirement contained in the Orders or related order of the Bankruptcy Court ("*Order Condition*"); <u>provided</u> that to the extent that any Order Condition that is the subject of an Order Default corresponds to a term, condition, provision or requirement hereunder, such Order Default will not constitute an Event of Default until the expiration of the applicable grace period for such corresponding term, condition, provision or requirement set forth in the DIP Agreement;<br><br>(d)    the DIP Agreement or any of the other DIP Documents at any time for any reason (other than cancellation by the DIP Lender) ceases to be in full force and effect or is declared null and void by a court of competent jurisdiction, or if the validity or enforceability thereof is contested or denied by Borrower in writing, or if the transactions contemplated by the DIP Agreement are contested by Borrower; | DIP Agreement §§ 8.1, 8.2; Interim Order ¶ 5(b)-(d) |

(e) this chapter 11 case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(f) a trustee or an examiner with enlarged powers relating to the operation of the Borrower's Business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in this chapter 11 case;

(g) entry of any order of the Bankruptcy Court dismissing this chapter 11 case unless and until the Obligations are paid in cash, in full;

(h) an application or motion is filed for the approval of a superpriority claim in this chapter 11 case that is senior to the claims of the DIP Lender against Borrower hereunder without the prior written consent of the DIP Lender;

(i) the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any Permitted Lien (i) to permit foreclosure or (ii) to authorize the grant of a deed in lieu of foreclosure or the like in respect of any of the Collateral, unless the party seeking the entry of such order first satisfies any and all Liens created in favor of the DIP Lender under the DIP Agreement through Borrowings made (in whole or in part) on behalf of Borrower against whom (x) the foreclosure occurs or (y) who conveys the Collateral securing such moving party's Permitted Lien;

(j) Borrower is in default under any Post-Petition Indebtedness outstanding in any individual case in an amount in excess of $150,000 or in an amount in excess of $300,000 in the aggregate, subject to any applicable cure period;

(k) except as permitted by the Order, Borrower makes any Pre-Petition Payment(s) other than Pre-Petition Payments or adequate protection payments authorized by the Bankruptcy Court;

(l) one or more judgments or orders as to post-Petition Date liability or debt are entered against Borrower involving (i) in any individual case an amount in excess of $150,000 or (ii) in the aggregate at any time an amount in excess of $300,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) and either (a) enforcement proceedings are commenced and are continuing by any creditor upon such judgment or orders or (b) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgments or orders, by reason of a pending appeal or otherwise, are not in effect; or (iii) any non-monetary judgment or order with respect to a post-Petition Date event rendered against Borrower which could reasonably be expected to result in a Material Adverse Effect and there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(m) the commencement of any suit or action by the Borrower against DIP Lender;

(n) the use of the proceeds of the DIP Loan by the

-9-

| | | |
|---|---|---|
| | Committee, whether or not on behalf of Borrower or its estate, to prosecute or otherwise pursue any claims against the DIP Lender or any of its Affiliates; or<br><br>(o)    any change having a Material Adverse Effect has occurred since the Closing Date.<br><br>**Remedies:** Termination of any obligation of the DIP Lender to make loans under the DIP Agreement and acceleration under the DIP Documents requiring repayment of the outstanding obligations in full and, subject to the rights of the holders of the WTI Loan, the ability of the DIP Lender to exercise all other rights and remedies available under the DIP Documents and applicable law. | |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Lender (and each of its affiliates, officers, directors, employees, and agents and each of their successors and assigns) will be indemnified and held harmless against, any loss, liability, reasonable cost or expense incurred in respect of the DIP Agreement or the use or the proposed use of the proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party), as determined by a final, non-appealable judgment of a court of competent jurisdiction. | DIP Agreement § 9.4; Interim Order ¶ 20 |

## RELIEF REQUESTED

11. By this Motion, pursuant to Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e) and Bankruptcy Rules 2002, 4001 and 9014, the Debtor requests:

   a. authorization for the Debtor to borrow up to $1,200,000 in principal amount (the "***Interim DIP Facility***"), on an interim basis, and up to a total of $3,000,000 in principal amount, on a final basis, of postpetition financing on the terms and conditions set forth in the DIP Agreement as attached hereto;

   b. authorization for the Debtor to execute and deliver any necessary documents, to perform such other and further acts as may be necessary or appropriate in connection therewith, and to grant the liens and security interests to the DIP Lender as provided for in the DIP Agreement;

   c. authorization to use cash collateral;

   d. that the Court grant liens and superpriority claims to the DIP Lender to secure the Debtor's obligations under the DIP Agreement; and

   e. the scheduling of a final hearing (the "***Final Hearing***") to consider entry of an order approving the DIP Facility on a final basis (the "***Final Order***").

## BASIS FOR RELIEF

### Request for Approval of the DIP Facility and Related Actions

12. As described above, it is essential to the success of the Debtor's chapter 11 case that the Debtor immediately obtain access to sufficient postpetition financing. The preservation of estate assets, the Debtor's continuing viability during this case and its ability to maximize value under its plan of reorganization, all depend heavily upon approval of the DIP Facility and the related actions requested herein.

13. Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

14. Because the Debtor proposes to obtain financing under the DIP Documents that is junior to existing secured liens, approval of the DIP Facility is governed by Bankruptcy Code § 364(c).

### Financing Under Bankruptcy Code § 364(c)

15. Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts

"permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

16. The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

17. Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

>   (a)   the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);
>
>   (b)   the credit transaction is necessary to preserve the assets of the estate; and
>
>   (c)   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

18. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c). *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*. at 1088. Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

19. The Debtor had numerous conversations with potential postpetition lenders, none of which were willing to extend credit on an unsecured basis. Based on its discussions with such potential lenders and the state of its own assets, the Debtor believes in its reasonable business judgment that it is unable to obtain unsecured financing from any capital source.

20. The Debtor (through a special committee of independent directors) and the DIP Lender engaged in arm's-length negotiations in the weeks leading up to the Petition Date, resulting in the financing proposal discussed in this Motion and proposed for approval by the Court. At no time did the DIP Lender manifest a willingness to extend the DIP financing without the protections afforded under section 364(c). Accordingly, the Debtor believes that the terms and conditions detailed in the DIP Agreement are reasonable and justified under the circumstances, are on the most favorable terms available to the Debtor, and this facility will

enable the Debtor to have sufficient liquidity to continue with its operations and the plan process in a manner that will enhance value to all parties in interest.

**Use of Cash Collateral and Adequate**
**Protection Under Bankruptcy Code §§ 363(c)(2) and 363(e)**

21. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval. Specifically, section 363(c)(2) states in pertinent part:

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

22. Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

23. What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, (Bankr. LEXIS 2456. *4 (Bankr, D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992). Through adequate protection, the Bankruptcy Code attempts to shield a secured creditor from diminution in the value of its interest in its collateral while it is being used by a debtor. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

24. Several courts have held that the presence of an equity cushion in encumbered collateral is itself a form of adequate protection. *See In re Realty Sw. Assocs.*, 140 B.R. at 366-67 (holding that creditor was adequately protected pursuant to Bankruptcy Code section 363(e) because of substantial equity cushion); *In re Am. Consol. Transp. Cos.*, No. 09-B-26062, 2010 Bankr. LEXIS 3144, *11 (Bankr. N.D. Il. Sept. 10, 2010) (finding adequate protection where there was a substantial equity cushion in the debtors' property); *In re Dynaco Corp.*, 162 B.R. 389, 398 (Bankr. D.N.H. 1993). *See also Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 53 (2d Cir. 1997) ("[I]n determining whether a creditor's interest in a debtor's property is adequately protected, most courts engage in an analysis of the property's 'equity cushion.'") (citation and internal quotation marks omitted)); *In re New Era Co.*, 125 B.R. 725, 728 (S.D.N.Y. 1991) ("[I]t is clear that one way to assure [adequate] protection is to have an 'equity cushion.'").

25. Here, the Debtor seeks authority to use the cash collateral of WTI, the Debtor's prepetition lender. The Debtor submits that there is little risk of diminution of WTI's collateral from the pendency of this chapter 11 case. First, limited cash is on deposit in the Debtor's HSBC operating account, on which WTI has a lien, as of the Petition Date. Any amounts deposited into the account at this point will be proceeds of the DIP Facility and incremental to WTI's current cash collateral.

26. In addition, WTI's remaining collateral – i.e., any interest it has in the stock of the Debtor's subsidiaries - is worth far in excess of amounts outstanding under the WTI Loans. Therefore, WTI is protected by virtue of a significant equity cushion making any diminution in value of WTI's collateral highly unlikely. Furthermore, the proceeds of the DIP Facility will be used to preserve the value of the Debtor's assets during the course of this chapter 11 case, which serves to further insulate WTI from diminution.

27. For the reasons discussed above, the Debtor believes that WTI is adequately protected under the circumstances to allow for the Debtor to utilize cash collateral – i.e., any cash deposited by the Debtor into its operating and other controlled accounts, without interference by WTI. The adequate protection proposed herein is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

**Protections Under Bankruptcy Code § 364(e)**

28. The Debtor believes that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith, at arm's length, and with the assistance of counsel on all sides. Accordingly, the DIP Lender should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estate**

29. It is essential that the Debtor obtain the financing necessary to continue, among other things, the orderly operation of the Debtor's business and this case, and to otherwise satisfy its working capital requirements. The DIP Facility is also essential to provide the Debtor's

-16-

various stakeholders, including customers, employees, and other key constituencies, with confidence in the Debtor's ability to administer this case and conclude its reorganization in a timely manner.

30.    Without immediate access to new borrowing relief, the Debtor's business operations and this case in general could grind to a halt, which would seriously jeopardize the Debtor's going-concern value. Thus, approval of borrowing under the DIP Agreement is crucial to maximizing the value of the Debtor's estate.

**The Terms of the DIP Agreement Are Fair, Reasonable, and Appropriate**

31.    The proposed DIP Agreement provides that the security interests and superpriority administrative expense claims granted to the DIP Lender are subject to the Carve-Out described above. In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

32.    Likewise, the Debtor believes that the fees and other charges required by the DIP Lender under the DIP Agreement are reasonable and appropriate under the circumstances. The proposed fees under the DIP Agreement are within the parameters of market fee structures for similar postpetition financing. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code § 364. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor in possession financing facility that included a lender "enhancement fee").

**Application of the Business Judgment Standard**

33.    As described above, after a fulsome marketing process and appropriate investigation and analysis, the special committee of the Debtor's board of directors, in

consultation with the Debtor's advisors, has concluded that the DIP Facility provides the best alternative available under the circumstances to the Debtor. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

34.     The Debtor submits that it has exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Agreement. Accordingly, the Court should grant the Debtor the authority to enter into any necessary DIP Documents and obtain funds from the DIP Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c).

**Request for Modification of the Automatic Stay**

35.     Bankruptcy Code § 362 provides for an automatic stay upon the filing of a bankruptcy case. As summarized above, the proposed DIP Agreement contemplates a modification of the automatic stay to permit (a) the Debtor to grant certain liens under the DIP Documents and to perform the Debtor's liabilities and obligations to the DIP Lender and (b) the exercise of remedies by the DIP Lender following an event of default. Upon the occurrence of an event of default and during the continuance thereof, the DIP Lender is entitled to exercise the

rights and remedies as set forth in the DIP Agreement. The Debtor submits that, in the Debtor's business judgment, such provisions are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Agreement.

### INTERIM RELIEF

36.     Pending final approval of the DIP Facility, the Debtor requests that this Court authorize the Debtor to borrow under the DIP Documents on an interim basis, pursuant to Bankruptcy Rule 4001(c)(2), to the extent necessary to avoid immediate and irreparable harm to its business and to this chapter 11 case prior to any final approval thereof. It is essential to the continued maintenance of the Debtor's assets and this case that the Court immediately authorize the Debtor to borrow up to $1,200,000 pending a final hearing. The Debtor urgently needs funds to allow it to meet payroll and other current operating expenses, including, without limitation, insurance, maintenance, lease, employee, and tax obligations as well as to pay the Debtor's professionals and to otherwise continue its ongoing operations. In addition, to secure a forbearance from WTI prior to filing, the Debtor agreed to seek approval to pay WTI $ 535,850 in respect of the Debtor's missed principal and interest payment in April, immediately upon the Petition Date. The payment to WTI is included in the Debtor's initial funding request, as are $125,000 of fees due to the DIP Lender. Thus, the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate, fully warranted, and essential to the Debtor's efforts to maximize the value of its estate in this chapter 11 case for the benefit of all of its stakeholders.

37. Accordingly, pending a final hearing on the Motion, the Debtor respectfully requests that the Court approve the terms of the DIP Agreement on an interim basis pursuant to the terms of the proposed Interim Order.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that this Court enter an Interim Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtor to obtain the postpetition financing described herein on an interim basis, (b) setting this Motion for a final hearing and (c) granting such other and further relief as this Court may deem just and proper.

Dated: April 25, 2013  
New York, New York

*/s/ Jennifer Feldsher*  
Jennifer Feldsher (JF 9773)  
Anna Rozin (AR 4830)  
**BRACEWELL & GIULIANI LLP**  
1251 Avenue of the Americas  
Telephone:   (212) 508-6100  
Facsimile:   (212) 508-6101

Attorneys for Debtor and Debtor in Possession